**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **HOLLY LINDAHL,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil No. 1:24-1692-CDA** |
| **SHEPPARD PRATT HEALTH SYSTEMS, INC.,** | * | |
| | * | |
| **Defendant.** | * | |

\*     \*     \*

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendant Sheppard Pratt Health Systems, Inc.'s Motion for Summary Judgment.  ECF 25-1.  Plaintiff, Holly Lindahl ("Plaintiff" or "Ms. Lindahl"), brings this employment discrimination suit against Defendant Sheppard Pratt Health Systems, Inc. ("Sheppard Pratt" or "Defendant").  This case arises out of the termination of Plaintiff's employment at Sheppard Pratt following the denial of her request for a religious exemption to the COVID-19 vaccine.  The parties fully briefed the issues and presented oral arguments on July 23, 2025.  ECF 29.  For the reasons stated below, the Court GRANTS the Motion for Summary Judgment.

### FACTUAL BACKGROUND

Sheppard Pratt is a private, non-profit behavioral health organization that provides a range of services to meet the needs of children, adolescents, adults, and elderly

adults.  Def.'s Ex. 1, Affidavit of Dr. Peters ("Peters Aff."), ECF 25-2, at ¶ 7.[1]  Sheppard

Pratt operates a 322-bed psychiatric hospital in Towson, Maryland (the "Hospital").  *Id.*,

at ¶ 9.  That facility provides inpatient and outpatient short- and long-term treatment of

adults, young adults, and children with psychiatric disorders, including eating disorders,

psychotic disorders, and trauma disorders.  *Id.*, at ¶ 10.

One component of Sheppard Pratt's Towson, MD psychiatric hospital is the Mann

Residential Treatment Center ("Mann Residential"),[2] which provides 24-hour residential

care for children ages 12-18 with severe emotional and behavioral challenges and offers

intensive psychiatric treatment and specialized education in a structured community.  *Id.*,

at ¶ 23.  Mann Residential treats individuals with a variety of conditions, including but

not limited to, borderline personality disorder, attention deficit hyperactivity disorder,

trauma-related disorders, anxiety disorders, schizophrenia, and mood disorders such as

depression, bipolar disorder, and seasonal affective disorder.  *Id.*, at ¶ 30.

Mental health disorders are associated with impaired immune function, often

leading to dysregulated immune responses such as increased inflammation and altered

immune cell activity, which increases the risk of individuals with mental health disorders

contracting the virus commonly known as COVID-19.[3]  *Id.*, at ¶ 31.  COVID-19 triggers

---

[1] As part of Defendant's summary judgment motion, Sheppard Pratt included the Affidavit of Dr. Todd Peters, the Vice President, Chief Medical Officer, and Chief Medical Information Officer at Sheppard Pratt.  *See* Peters Aff., at ¶ 2.

[2] Mann Residential was recently renamed as the "Sheppard Pratt School and Residential Treatment Center."  ECF 25-1, Def.'s Mot. for Summ. J. ("Def.'s MSJ"), at 6 n.1.

[3] Considering the impact of the global coronavirus pandemic that arrested much of the world, and certainly this country, the Court assumes the reader is generally familiar with the term COVID-19.  *See Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 168 (4th Cir. 2024) ("In the spring of 2020, the COVID-19 pandemic devastated the United States, its people, and its businesses."); *Bushra v. Main Line Health, Inc.*, 709 F.

inflammation in the body; thus, the impaired immune function for those with mental disorders also increases their risk of severe illness, hospitalization, and death from COVID-19. *Id.* Moreover, individuals with mental health disorders are more likely to have comorbidities—such as diabetes, cardiovascular problems, kidney disease, and Chronic Obstructive Pulmonary Disease—that place them at greater risk for negative outcomes from COVID-19. *Id.*, at ¶ 32. In fact, mental health conditions can double an individual's risk of hospitalization or death from COVID-19. *Id.*, at ¶¶ 33-34. Additionally, the COVID-19 pandemic "fueled an increase in mental health disorders because such disorders are triggered and exacerbated by isolation and loneliness," especially for children and adolescents. *Id.*, at ¶¶ 40-41.

Mann Residential provides a mix of individual and group therapy along with treatment in a school setting on site. *Id.*, at ¶ 35. As a result of its residential-based program, Mann Residential provides non-public education to all children enrolled in the program pursuant to Maryland State Department of Education's requirements. *Id.*, at ¶ 46. While Mann Residential has several distinct units, the units congregated together given the limitations on the number of educators, time, and available space; as such, children from separate units passed each other in the halls and intermingled in class. *Id.*, at ¶ 47.

Despite Sheppard Pratt's efforts to separate children by unit and implement rigorous COVID-19 protocols, the patient population at Mann Residential experienced a heightened risk for exposure to and spread of COVID-19 due to the congregation of children from separate units, as necessitated by the Maryland Department of Education's

---

Supp. 3d 164, 175 (E.D. Pa. 2023) (taking judicial notice "that COVID-19 caused a deadly global pandemic at a scale unseen in a century").

requirements. *Id.*, at ¶¶ 48, 49. Further, the educational and therapeutic programming necessary for positive treatment outcomes at Mann Residential required patients to interact in close proximity to one another and to staff: i.e., most patients shared rooms; patients participated in daily group programming; and staff nurses had daily close contact with patients through administering medication, taking vital signs, and engaging in behavior and crises interventions. *Id.*, at ¶¶ 36-39; ECF 25-4, Deposition of Holly Lindahl ("Lindahl Dep."), Tr. 55:13-56:16. Plaintiff denies "any assertion that Sheppard Pratt's patients were any more vulnerable to adverse effects from COVID-19 than anyone else could be[,]" but does not cite any evidence supporting her contention. *See* ECF 26-1, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, ("Pl.'s MSJ Opp'n"), at 5.

Plaintiff began working as a Staff Nurse at Mann Residential in September 2017.[4] Lindahl Dep, Tr. 48:15-18. As part of her application, Plaintiff indicated that she "agree[d] to be immunized as necessary" and that she understood that, as a condition of her employment, she "had to be immunized as necessary[.]" *Id.*, Tr. 48:2-14. This role required face-to-face interactions with Mann Residential's patients, including conducting assessments on patients, administering patient's medications, evaluating patients, taking patients' vitals, and responding to crises, such as providing crisis intervention medications by administering injections and providing medical care. *Id.*, Tr. 54:10-56:13, 58:10-16. Plaintiff interacted with approximately 20 to 80 different patients each shift and sometimes interacted with a patient multiple times per shift. *Id.*, Tr. 53:18-54:21,

---

[4] From June 2008 through September 2015, Plaintiff worked as a Per Diem Nurse at Sheppard Pratt. From September 2011 through 2016, Plaintiff worked as a Part-Time Quality and Compliance Specialist at Sheppard Pratt. *See* Lindahl Dep., 25:6-9, 25:22-26:4, 26:9-12.

61:13-63:13, 69:8-12.  Plaintiff's role required her to enter patients' rooms, always in the presence of another staff member, for various tasks including if a patient had a mental health crisis; if a patient asked to speak with a nurse; and to take patient's vital signs.  *Id.*, Tr. 64:2-15.

When she worked in the female unit at Mann Residential, Plaintiff shared the Nursing Suite with at least one other Staff Nurse.  This is where Staff Nurses generally administered medications and assessed patients.  *Id.*, Tr. 65:14-66:2, 71:6-11.  Each shift, Plaintiff attended staff meetings lasting about thirty minutes with approximately seven employees attending each staff meeting.  *Id.*, Tr. 60:9-61:12.  Plaintiff interacted, or came into contact, with approximately 10 different employees each shift.[5]  *Id.*, Tr. 72:19-21.

In response to the COVID-19 pandemic, Sheppard Pratt established an infection control department to monitor and implement COVID-19 protocols, relying on guidance from the Maryland Department of Health and the United States Centers for Disease Control and Prevention ("CDC").  Peters Aff., at ¶¶ 16-17; *see id.*, at ¶¶ 12-15.  Of the twenty-two COVID-19 outbreaks at Sheppard Pratt's main hospital between September 30, 2020 and November 29, 2021, six outbreaks occurred at Mann Residential.  *Id.*, at ¶ 44.  These outbreaks led to a stoppage in new-patient admissions to Mann Residential.  *Id.*, at ¶ 43.  Some patients who contracted COVID-19 were sent to an acute care facility, interrupting and extending their psychiatric treatment.  *Id.*, at ¶ 42.  Moreover, these outbreaks, which lasted between ten and thirty-eight days, substantially impacted Sheppard Pratt's operations: each occurrence required Sheppard Pratt to isolate patients;

---

[5] Plaintiff argues that "there is no strict requirement that Plaintiff must attend the staff meetings face-to-face."  Pl.'s MSJ Opp'n, at 8 (citing ECF 26-7, at 1-2) (Sheppard Pratt's job description of the Staff Nurse position).

alter the unit's programming; disrupt the unit's treatment; enlist agency coverage for additional staffing, which was more expensive on a per hour basis that staffing through the Hospital's own employees; and purchase additional Personal Protective Equipment ("PPE") for staff to wear, including face shields or goggles, gloves, isolation gowns, and N95 masks or higher respirators.[6]  *Id.*, at ¶¶ 19-27, 41.

In August 2021, Sheppard Pratt announced that, in compliance with state and federal guidance, it would be implementing a vaccination policy that required all employees to have their first dose of the COVID-19 vaccine by September 1, 2021.[7]  *Id.*, at ¶ 67; *see* ECF 25-2, at 22-23 (email from Sheppard Pratt's President and CEO, and its Vice President of Human Resources, Karen Robertson-Keck ("Ms. Robertson-Keck"), regarding this update); Lindahl Dep., Tr. 90:4-9.  At the time of Sheppard Pratt's vaccination policy implementation, COVID-19 cases were surging due to the spread of Delta, a highly contagious variant of the disease.  Peters Aff., at ¶ 69.  That month in Maryland, COVID-19-related hospitalizations reached the highest number they had been since May 2021; the number of new cases in the state had more than doubled each of the last three consecutive months; and over 10,000 people died in the state alone.  *Id.*, at ¶¶ 69-74.

---

[6] Plaintiff asserts that Sheppard Pratt did not experience a financial burden, "as staff was asked to conduct their own temperature checks and take their own measure concerning symptomatology."  Pl.'s MSJ Opp'n, at 7 (citing ECF 25-5, Deposition of Todd Peters ("Peters Dep."), Tr. 21:2-22:8).

[7] Earlier that week, the Maryland Secretary of Health issued an Amended Directive and Order Regarding Vaccination Matters that required all employees of healthcare facilities, such as Sheppard Pratt, to be vaccinated against COVID-19 by September 1, 2021.  Peters Aff., at ¶ 65; *see* ECF 25-2, at 22 (Sheppard Pratt email referencing Governor Hogan's then-latest COVID-19 order).

Sheppard Pratt released its formal vaccination policy in November 2021.[8]  ECF 25-2, at 25-29 ("Mandatory Flu Vaccination & COVID-19 Policy for Inpatient Hospitals, PA, and RTCs," Nov. 8, 2021).  That policy provided, among other things, that:

> In recognition of the essential and critical nature of Sheppard Pratt's work, we must hold ourselves to the highest standards of preventive health measures.  As such, Sheppard Pratt has a responsibility to promote employee safety and prevent the spread of infectious diseases, including COVID-19.  Meeting all aspects of this policy is a condition of working at our facility as an employee, volunteer, or contractor (all of whom will be referred to collectively in this policy as "staff").
>
> **Requirements of Vaccination**
>
> In order to conform with applicable federal and state requirements, including the Maryland Secretary of Health's Amended Directive and Order Regarding Vaccination Matters dated August 18, 2021, recommendations from the Centers for Disease Control and Prevention, and to help staff and the community from transmission of COVID-19, all staff are required to show proof of first dose or single dose of COVID-19 vaccination by September 1, 2021. All staff are required to complete the full shot regimen, including any booster shot, as clinically indicated in order to satisfy this requirement.
>
> . . .
>
> Noncompliant staff will be met with individually and will exit employment. Should the individual become compliant by either being vaccinated or by obtaining an approved medical or religious exemption before the last day of work, employment will continue.

*Id.*, at 27-28.  Sheppard Pratt provided that religious and medical exemptions would be considered and that it may grant "a religious exemption from the policy based on a sincerely held religious belief."  *Id.*, at 28.  Sheppard Pratt considered each exemption request on a case-by-case basis and reserved the right to "determine that the risk posed

---

[8] During the hearing, defense counsel noted that, as of May or June 2024, Sheppard Pratt no longer requires the COVID-19 vaccine for its employees.

by an unvaccinated staff member cannot be mitigated and/or constitutes an 'undue hardship' under state and federal law." *Id.*

Sheppard Pratt directed employees to send requests for bona fide medical or religious exemptions to Employee Relations. Peters Aff., at ¶ 67; *see* ECF 25-2, at 22; Lindahl Dep., Tr. 95:2-8. Sheppard Pratt reviewed each exemption request on a case-by-case basis, although approval was not guaranteed.[9] ECF 25-6, Deposition of Ms. Robertson-Keck in *Hall v. Sheppard Pratt Health Sys., Inc.*, 749 F. Supp. 3d 532 (D. Md. 2024) ("Robertson-Keck Dep. in *Hall*"), Tr. 28:3-5; *see* ECF 25-2, at 28.[10] Ms. Robertson-Keck spoke with the manager of every employee that asked for an exemption to discuss the employee's job duties and, if the employee's job involved in-person contact, they discussed whether the position's essential functions could be performed without in-person contact. Robertson-Keck Dep. in *Hall*, at 22:17-23:9, 27:5-17. Ms. Robertson-Keck also met with every employee that requested an exemption and informed those employees that Sheppard Pratt did not question the sincerity of their religious beliefs.[11] *Id.*, at 19:14-20:1, 23:10-22.

---

[9] Plaintiff disputes that Sheppard Pratt reviewed each exemption on a case-by-case basis, arguing that "each exemption was grouped together[,] and mass decisions were made at the discretion of Robertson-Keck as she determined whether the religious views were 'based on a sincerely held religious belief.'" Pl.'s MSJ Opp'n, at 8-9. Yet, at oral argument, Plaintiff's counsel also maintained that Sheppard Pratt personnel did not thoroughly inquire about the sincerity of Lindahl's beliefs and should have explored the beliefs more.

[10] Counsel for the parties "agreed to cross designate certain relevant and applicable testimony [from Ms.] Robertson-Keck's deposition in *Hall v. Sheppard Pratt Health Sys., Inc.*, No. 22-CV-3261-ABA into this matter for efficiency purposes." Def.'s MSJ, at 15 n.2; *see* ECF 25-3, Deposition of Karen Robertson-Keck in *Lindahl v. Sheppard Pratt Health Sys., Inc.*, No. 24-1692 ("Robertson-Keck Dep. in *Lindahl*"), Tr. 9:6-14.

[11] Sheppard Pratt sent medical exemption requests to a third-party medical doctor, Dr. Ahmed Nawaz. Dr. Nawaz reviewed these requests on a case-by-case basis and gave recommendations based on CDC guidance. *See* Robertson-Keck Dep. in *Hall*, Tr. 20:6-

If an employee's job functions could be performed remotely, Sheppard Pratt permitted the employee to work remotely; but if they could not, Ms. Robertson-Keck discussed with the employee whether their skillset would qualify them for other roles that did not need to be performed in person. *Id.*, at 24:7-21. According to Ms. Robertson-Keck, of the 200 religious exemption requests it received, Sheppard Pratt granted approximately 24. Robertson-Keck Dep. in *Lindahl*, Tr. 28:2-12. If an employee's exemption request was denied, they were terminated and remained eligible for rehire. *Id.*, at 37:2-21; *see* ECF 25-2, at 28.

Shortly after Sheppard Pratt's vaccination policy announcement in August 2021, Plaintiff submitted a religious exemption request, accompanied by a letter of support from her pastor. Lindahl Dep., Tr. 117:19-120:12; *see* ECF 25-7 ("Pl.'s Exemption Request"), at 1-4. Plaintiff stated the following as the basis for her religious exemption request:

> I believe my physical body is the temple of the Holy Spirit and that I must not allow harmful substances to enter it. Further, I am against the use of fetal cell lines used in developing vaccines. I am against all vaccines that are harmful or that use fetal cell lines in their development.

Pl.'s Exemption Request, at 2 (citations omitted); *see* Lindahl Dep., Tr. 96:16-21.

Consistent with Sheppard Pratt's vaccination policy, after receiving Plaintiff's exemption request, Ms. Robertson-Keck spoke with Plaintiff's supervisor to assess, if Plaintiff remained unvaccinated, whether Plaintiff's essential job functions could be reconfigured in a way that would maintain patient safety. Robertson-Keck Dep. in *Lindahl*, Tr. 18:12-19:14. On October 13, 2021, Plaintiff met with Ms. Robertson-Keck;

---

21:6. Sheppard Pratt granted approximately 60-70 of the 100 medical exemption requests. Robertson-Keck Dep. in *Lindahl*, Tr. 28:2-5.

Ricky Santico, Director of Employee Relations; and Fitzgeral Goodridge, Senior Administrative Manager, Residential Programs and Schools, to discuss her exemption request. Lindahl Dep., Tr. 126:3-22. Ms. Robertson-Keck told Plaintiff that Sheppard Pratt respected her religious beliefs and did not question them. Robertson-Keck Dep. in *Lindahl*, Tr. 30:13-16. She advised Plaintiff that Sheppard Pratt could not accommodate Plaintiff's exemption request for various reasons: Plaintiff worked in a patient-facing position; it was not possible to work in this face-to-face role while unvaccinated for safety reasons; and there was no appropriate alternative options to vaccination that would have allowed Plaintiff to perform the essential functions of her job while maintaining patient safety, *i.e.*, patient-facing employees were not able to maintain six feet of distance. *Id.*, Tr. 19:6-21:17; *see* Lindahl Dep., Tr. 127:1-128:22, 130:4-20, 139:2-10.

Sheppard Pratt concluded that no alternatives would be sufficient to mitigate the safety risks that an unvaccinated individual in a patient-facing position would pose to the vulnerable Mann Residential patients. Robertson-Keck Dep. in *Lindahl*, Tr. 19:15-20:5. For instance, all employees were already required to wear masks regardless of vaccination status. Peters Aff., at ¶ 59. Sheppard Pratt concluded that it did not have the capacity or resources to implement weekly or daily testing on-site for employees, noting that tests were reserved for symptomatic individuals and outbreak mitigation due to the testing shortage at the time. *Id.* at ¶¶ 63-64; *see* Peters Dep., Tr. 21:2-11, 51:2-22. Sheppard Pratt was also concerned about the reliability and effectiveness of weekly testing; in its view, testing could produce false negatives, and testing only once a week meant Plaintiff may test negative but subsequently contract and carry COVID-19 before the next week's test. Peters Aff., at ¶¶ 59-62. Further, the available medical data suggested that "COVID-19 vaccines have high efficacy and are the safest strategy in protecting against known

10

variants, including the Delta variant, particularly in preventing asymptomatic and symptomatic COVID-19, hospitalizations, and death[;]" unvaccinated individuals were up to three times more likely to be infected with COVID-19 than those who were vaccinated; vaccinated individuals are less likely to transmit COVID-19 than those that were unvaccinated; and transmission between unvaccinated persons remained the leading reason for the ongoing spread of the virus. *Id.* at ¶¶ 50-56.

During the meeting with Plaintiff, Ms. Robertson-Keck discussed with Plaintiff her skills, education, and resume to explore whether Plaintiff's skillset may qualify her for a different role with Sheppard Pratt that did not require face-to-face interaction; however, Sheppard Pratt was unable to identify a vacant position that matched Plaintiff's skillset that would not compromise its safety requirements.[12]  Robertson-Keck Dep. in *Lindahl*, Tr. 19:21-22:21.  Ms. Robertson-Keck also showed Plaintiff Shepard Pratt's job postings on its website, *id.*, Tr. 23:13-19, but Plaintiff did not apply for any other positions at Sheppard Pratt, Lindahl Dep., Tr. 140:8-10.  Plaintiff's last day of employment at Sheppard Pratt was November 19, 2021—she remains eligible for rehire.[13]  Lindahl Dep., Tr. 140:5-141:10.

---

[12] Plaintiff disputes that Ms. Robertson-Keck had any "meaningful discussion" with her "related to her religion, need for accommodation, other skills, previous employment, background, or alternatives" and "did not offer a modified or different position as an accommodation," asserting that it was unclear whether her previous role as a Quality and Compliance Specialist was needed at Sheppard Pratt at that time, and could have been done remotely.  Pl.'s MSJ Opp'n, at 7-8.

[13] Plaintiff's briefing now "denie[s] that [her] last day working for the Defendant was November 19, 2021, as she continued working for Defendant until December 2021."  Pl.'s MSJ Opp'n, at 6 (citing ECF 25-2, at 1).  However, the Complaint states that her last day of work was in November 2021.  *See* Complaint, ECF 1 at ¶¶ 2, 17, 28, 35; Lindahl Dep., Tr. 140:5-7.  She also notes that her personnel file incorrectly states that she voluntarily resigned; but Sheppard Pratt terminated her.  Pl.'s MSJ Opp'n, at 6; *see* ECF 26-2, at 1.

**PROCEDURAL BACKGROUND**

Plaintiff commenced this civil suit on June 11, 2024, asserting that Sheppard Pratt discriminated against her based on her religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  ECF 1.  Plaintiff alleges that Sheppard Pratt failed to accommodate her religious beliefs; however, it is uncertain if Plaintiff intended to pursue a claim for disparate treatment or retaliation.  Sheppard Pratt filed an Answer denying the allegations and asserting undue hardship as an affirmative defense.  ECF 15.

Now pending before the Court is Defendant's Motion for Summary Judgment as to all claims in Plaintiff's Complaint.  ECF 25.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have an "affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the

nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see Scott v. Harris*, 550 U.S. 372, 378 (2007).

Summary judgment is appropriate where the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material facts. *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

In considering a summary judgment motion, the court does not make credibility determinations. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Therefore, in the face of conflicting evidence, such as competing affidavits or other testimony, summary judgment ordinarily is not appropriate; the factfinder must resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020) (citation omitted); *see also Felty*, 818 F.2d at 1128 ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

ANALYSIS

For the reasons stated below, the Court grants Defendant's Motion for Summary Judgment.  Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  The statute broadly defines religion as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  "The regulations define religious practices to 'include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.'" *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025) (citing 29 C.F.R. § 1605.1 (2024)).

"Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996) (citing *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993)).  "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.*

## I.   Summary Judgment is <u>GRANTED</u> as to Plaintiff's religious discrimination claim under the failure-to-accommodate theory.

Plaintiff has failed to adduce evidence creating a genuine dispute of material fact whether accommodating Plaintiff's religious exemption request would have imposed an undue hardship for Sheppard Pratt.

Religious discrimination claims based on an employer's failure to accommodate an employee's religious beliefs are evaluated under the burden-shifting framework set forth

14

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Equal Emp't Opportunity Comm'n v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008).  Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination, showing that Plaintiff (1) "has a bona fide religious belief that conflicts with an employment requirement[,]" (2) "informed the employer of this belief[,]" and (3) "was disciplined for failure to comply with the conflicting employment requirement."  *Id.* (citing *Chalmers*, 101 F.3d at 1019).  If Plaintiff meets this *prima facie* burden, the burden then shifts to the employer to show that the employee's request cannot be accommodated without "undue hardship."  *Id.*  Rather than challenge whether Plaintiff establishes a *prima facie* failure-to-accommodate claim, Sheppard Pratt instead focuses on the undue hardship of Plaintiff's exemption request.[14]  Def.'s MSJ, at 19-30.  As such, the Court assumes, without deciding, that the undisputed material facts establish a *prima facie* failure-to-accommodate claim.

Title VII does not define "undue hardship."  The Supreme Court explains that to establish an undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).  Courts should resolve the undue hardship issue in a "common-sense manner" upon considering "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer."  *Id.* at 470-71 (alteration in original) (internal quotation marks and citation omitted).  The costs associated with a religious accommodation do not need to be economic.  *Id.* at 475

---

[14] During the hearing, defense counsel confirmed that they are not contesting that Plaintiff established a *prima facie* failure-to-accommodate claim.

15

(Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees.") (alteration in original). "For instance, courts have found that non-economic costs such as damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees, can constitute undue hardships." *United States Equal Emp't Opportunity Comm'n v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 752 (D. Md. 2021); *see also Equal Emp't Opportunity Comm'n v. The GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer-prison.").

In the context of cases involving religious accommodation claims related to vaccination against COVID-19, "[n]umerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025); *see also Chavez v. San Francisco Bay Area Rapid Transit Dist.*, 723 F. Supp. 3d 805, 821 (N.D. Cal. 2024) ("Increased health and safety risks – including risks to the continued operation of the business due to employee illness and death – may likewise impact the conduct of a business."). The Fourth Circuit recently applied the *Groff* standard when finding that the possibility of an unvaccinated individual jeopardizing patient safety and increasing "the risk of disruptive outbreaks in a sensitive environment" should be considered in an undue hardship analysis. *Hall v. Shepard Pratt Health Sys.,*

*Inc.*, 155 F. 4th 747 (4th Cir. 2025).[15]  In *Miller v. Charleston Area Medical Center, Inc.*, the Fourth Circuit further emphasized this standard, holding that "the increased risk of transmission alone is sufficient to demonstrate an undue hardship to [a] hospital." No. 24-2129, 2026 WL 35966, *4 (4th Cir. Jan. 6, 2026).[16]

Here, Sheppard Pratt argues that granting Plaintiff's exemption request would have created an undue hardship because "Plaintiff's exemption would have unjustifiably increased the risk of COVID-19 infection and transmission in Mann Residential, which posed a safety risk for patients and staff and would have impaired the treatment of patients of Mann Residential." Def.'s MSJ, at 22-23.  The Court finds that the undisputed material facts support Sheppard Pratt's position.

Plaintiff, as a patient-facing Staff Nurse at Mann Residential, regularly interacted with both patients and other staff members each shift. Lindahl Dep, Tr. 48:15-18.  On any given shift, Plaintiff interacted with approximately 20 to 80 medically vulnerable patients, and 10 different employees.  *Id.*, Tr. 53:18-54:21, 72:19-21.  This role required Plaintiff to enter patients' rooms and required face-to-face interactions with Mann Residential's patients, including conducting assessments on patients, administering patient's medications, evaluating patients, taking patients' vitals, and responding to crises, such as providing crisis intervention medications by administering injections and

---

[15] Sheppard Pratt submitted a Notice of Authority after the Fourth Circuit's decision, flagging for the Court that several of the arguments raised and decided in *Hall* are also relevant here. *See* ECF 30.  Plaintiff argues that *Hall* does not control the outcome and that the Court must disregard the Notice of Authority. *See* ECF 31.  The Court disagrees. While the factual record here differs from *Hall*, the controversy is the same—whether Shepard Pratt violated Title VII when it denied a religious accommodation request. Thus, *Hall*'s application of *Groff* carries persuasive force, at the least, here.

[16] Defendant submitted a second Notice of Authority following the Fourth Circuit's issuance of *Miller*, 2026 WL 35966.  *See* ECF 32.

providing medical care. *Id.*, Tr. 54:10-56:13, 58:10-16, 64:2-15. Plaintiff also attended staff meetings each shift and, if she worked in the female unit at Mann Residential, shared a Nursing Suite with at least one other Staff Nurse. *Id.*, Tr. 60:9-61:12, 65:14-66:2, 71:6-11.

Moreover, the patients at Mann Residential suffered from mental illnesses that increased their risk of not only contracting COVID-19 but also their risk of severe illness, hospitalization, and death from COVID-19. Peters Aff., at ¶¶ 30-31. These individuals with mental health disorders are more likely to have comorbidities, putting them at greater risk from negative outcomes from COVID-19, including hospitalization or death. *Id.*, at ¶¶ 32-34. The residential-based program at Mann Residential, necessitating that patients interact and congregate for educational and therapeutic purposes, compounds the measures needed to protect these patients from exposure to COVID-19. *Id.*, at ¶¶ 35, 46-49. Infection among patients or staff not only risked serious illness or death but also impacted staffing; new-patient admission; and patients' treatment and quality of care. *Id.*, at ¶¶ 28-29, 36-43. A common-sense assessment of the facts and circumstances of this case leads the Court to conclude as a matter of law that granting Plaintiff a religious accommodation would have presented an undue hardship, which would have been "particularly acute in a health care setting." *Hall*, 155 F.4th at 753; *see also Yockey v. Greater Baltimore Med. Ctr., Inc.*, No. ABA-23-512, 2025 WL 860158, at *6 (D. Md. Mar. 18, 2025) (noting that the defendant hospital's "daily work of serving vulnerable patients is central to a 'common sense' analysis"); *Marucci v. Greater Baltimore Med. Ctr., Inc.*, No. ABA-23-510, 2025 WL 860137, at *7 (D. Md. Mar. 18, 2025) (finding it reasonable for the defendant hospital "to insist upon strong measures to prevent potential COVID-19 transmission to patients").

Indeed, courts in this Circuit, and elsewhere, have repeatedly found similar facts and circumstances constitute undue hardship with respect to the COVID-19 vaccine. *See, e.g.*, *Hall*, 155 F.4th at 753-55; *Kizer v. St. Jude Children's Rsch. Hosp., Inc.*, 741 F. Supp. 3d 726, 750 (W.D. Tenn. 2024), *aff'd sub nom. Kizer v. St. Jude Children's Rsch. Hosp.*, No. 24-5207, 2024 WL 4816856 (6th Cir. Nov. 18, 2024) (undue hardship where "allowing Plaintiff to come to work unvaccinated while continuing [masking, testing, and physical distancing requirements] would have been a substantial burden for St. Jude" considering its mission, health and safety concerns, the impact of diverting employees and other resources, and financial impact, in addition to potential legal liabilities); *Bushra*, 709 F. Supp. 3d at 175-76 (undue hardship where an emergency room doctor "was at great risk of contracting and transmitting [COVID-19] because he had frequent and direct contact with patients and staff"); *Dodson v. Lutheran Vill. at Millers Grant, Inc.*, No. EA-23-169, 2025 WL 1474319, at *9 (D. Md. May 22, 2025) (undue hardship where plaintiff was "an occupational therapist at a skilled nursing facility" and had "very close physical contact with elderly, medically vulnerable individuals"); *Yockey*, 2025 WL 860158, at *1, 5-6 (undue hardship to accommodate nurse who "work[ed] primarily with newborn babies and birthing parents"); *Cyr v. Bos. Med. Ctr.*, No. 1:22-CV-11930-JEK, 2025 WL 269239, at *1, 5 (D. Mass. Jan. 22, 2025) (undue hardship in context of "Staff Nurse at Neonatal Intensive Care Unit"); *Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2024 WL 4518293, at *5 (S.D.W. Va. Oct. 17, 2024) ("Historically, being forced to accommodate an unvaccinated employee has been more than enough to pose an undue hardship for medical facilities across our nation actively combatting the COVID-19 pandemic even today."), *aff'd sub nom. Miller v. Charleston Area Med. Ctr., Inc.*, No. 24-2129, 2026 WL 35966 (4th Cir. Jan. 6, 2026); *Snow v. Women's Healthcare Assocs.,*

*LLC*, No. 3:23-cv-01393-IM, 2024 WL 3640111, at *2, 6 (D. Or. Aug. 2, 2024) (undue hardship regarding health clinic receptionist who had "direct interaction with patients and visitors"); *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022) (finding, at the preliminary injunction stage, a hospital's reasonable likelihood of success in showing undue hardship based on the mission of caring for a medically vulnerable population and the relative limits of testing compared to vaccination).[17]

Notably, courts have also found permitting unvaccinated employees to work in non-healthcare settings to constitute an undue hardship due to the COVID-19 pandemic. *Davis v. Reliance Test & Tech., LLC*, No. DKC 22-1760, 2025 WL 266664, at *7 (D. Md. Jan. 22, 2025) (permitting plaintiff to work unvaccinated constituted an undue hardship because this posed a health risk to their coworkers and other individuals); *Antredu v. Mass. Dep't of Youth Servs.*, 729 F. Supp. 3d 76, 84 (D. Mass. 2024) (same); *Bordeaux*, 703 F. Supp. 3d at 1135 (same).

No evidence in the record permits a reasonable jury to find facts to the contrary. Plaintiff advances several arguments that are unavailing and lack evidentiary support. First, she argues that she did not pose a safety risk as an unvaccinated individual, denying that "Sheppard Pratt's patients were any more vulnerable to adverse effects from COVID-[19] than anyone else could be[,]" and denying that vaccination is the best measure to reduce COVID-19 infection and transmission. Pl.'s MSJ Opp'n, at 5-6. However, Plaintiff does not cite any evidence to rebut Sheppard Pratt's evidentiary support (or the common sense conclusion informed by the chorus of cases concluding otherwise). Plaintiff asserts

---

[17] This list of comparable cases is extensive yet nowhere close to exhaustive.

that these are disputed material facts because "other facilities, such as Plaintiff's current employer, hire nonvaccinated staff who work doing nearly identical duties as those listed by Defendant that Plaintiff was tasked with." *Id*., at 16 (citing Lindahl Dep., Tr. 184:21-185:13). Such matters are irrelevant to the Court's assessment of the circumstances surrounding Sheppard Pratt's denial of Plaintiff's religious accommodation, which the Supreme Court has instructed must be evaluated by "tak[ing] into account all relevant factors *in the case at hand.*" *Groff*, 600 U.S. at 470 (emphasis added); *see Marucci*, 2025 WL 860137, at \*6 (finding that the employer could not have accommodated the nurse's vaccine exemption without undue hardship and, as such, rejecting nurse's contention that her employer did not show "that an undue hardship would have resulted from her requested accommodation because other hospitals granted her that accommodation").

Second, Plaintiff argues that Sheppard Pratt "overlapped" its approaches to reviewing medical exemptions and religious exemptions because Ms. Robertson-Keck suggested that others, but not Plaintiff, should "seek medical exemptions, rather than religious, in a creative approach to allow them to continue working unvaccinated." Pl.'s MSJ Opp'n, at 9. Defendant disputes Plaintiff's characterization of these facts, asserting that "[i]f individuals who sought religious exemptions revealed that they had a medical contraindication and had not applied for a medical exemption, Ms. Robertson-Keck suggested that they do so. By way of example, one such employee stated that she had taken another vaccine and was hospitalized and nearly died." Def.'s Reply, at 13-14 (citing Robertson-Keck Dep. in *Lindahl*, Tr. 28:13-29:8). Plaintiff also takes issue with the fact that Sheppard Pratt granted certain medical exemptions and religious exemptions, and in turn allowed those employes to work unvaccinated, but failed to offer her an exemption. Pl.'s MSJ Opp'n, at 13, 16. With respect to medical exemptions, the Americans with

21

Disabilities Act ("ADA") has its own definition of undue hardship, requiring an employer to show that accommodation "would impose" a hardship entailing "significant difficulty or expense." 42 U.S.C. § 12112(b)(5) (ADA undue hardship provision); *id.* § 12111(10) (defining undue hardship for ADA purposes). The Supreme Court expressly rejected the invitation in *Groff* to incorporate the ADA standard into Title VII. 600 U.S. at 471; *see also id.* at 474 (Sotomayor, J., concurring) ("Petitioner Gerald Groff asks this Court to overrule *Hardison* and to replace it with a 'significant difficulty or expense' standard. . . . The Court does not do so."). Whether Sheppard Pratt was justified in accommodating certain medical exemption requests is not only governed by a different standard, but also not a question before the Court in this case.

Moreover, Sheppard Pratt's decision to grant certain medical and religious exemptions does not, as Plaintiff insists, suggest that Sheppard Pratt found Plaintiff's religious belief "not sincere" and did not take her religious beliefs seriously. *See* Pl.'s MSJ Opp'n, at 8-9, 15-16. Plaintiff does not cite to any evidence to support these assertions.[18] Such an inference, without more, amounts to "unsupported speculation," which cannot defeat summary judgment. *Felty*, 818 F.2d at 1128. Plaintiff also insists that Sheppard Pratt did not review each exemption request on a case-by-case basis. Pl.'s MSJ Opp'n, at 6, 8-9. However, the record reflects that Sheppard Pratt reviewed exemption requests on

---

[18] To be sure, Plaintiff asserts that Defendant, in its summary judgment motion, noted that "[w]hile Plaintiff testified that this was a 'very serious conviction,' she consumed Motrin, Tylenol, Pepto-Bismol, and aspirin without ever having questioned whether such medicines were developed using fetal cell lines[,]" *see* Def.'s MSJ, at 18, demonstrating that Defendant "never took Plaintiff's religious beliefs seriously[,]" *see* Pl.'s MSJ Opp'n, at 16. Setting aside whether the implications of the defense briefing are persuasive, it is unclear how this statement in summary judgment briefing is relevant to Sheppard Pratt's decisions at the time Sheppard Pratt denied Plaintiff's exemption request. *See also* Lindahl Dep., Tr. 131:3-5 (Q. "[Ms. Robertson-Keck] didn't question your religion, right? A: I don't believe so.").

a case-by-case basis, and Plaintiff does not cite any evidence to the contrary. *See* ECF 25-2, at 28; Robertson-Keck Dep. in *Hall*, Tr. 28:3-5. Additionally, Sheppard Pratt received approximately double the requests for religious exemption than medical exemption. *See* Robertson-Keck Dep. in *Lindahl*, Tr. 28:2-12. Although these requests were evaluated on a case-by-case basis, it was within Sheppard Pratt's discretion and responsibility to consider the aggregate impact of granting multiple employees the same accommodation. *See e.g., Groff*, 600 U.S. at 468 (requiring employers to consider hardship in "the overall context of an employer's business"); *see also id.* at 476 (Sotomayor, J., concurring) ("[F]or many businesses, labor is more important to the conduct of the business than any other factor."); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977) (holding that employers may properly consider the aggregate effect of granting an accommodation where other employees may be similarly situated).

Plaintiff also argues that Sheppard Pratt did not engage in an appropriate interactive process in considering Plaintiff's religious exemption request. Pl.'s MSJ Opp'n, at 12, 15-16. As Defendant posits, Judge Chasanow recently rejected the same argument by Plaintiff's counsel. Def.'s Reply, at 7-8 (citing *Davis*, 2025 WL 266664, at *7). In *Davis*, Judge Chasanow noted that while an interactive process is required under the ADA, "[p]laintiffs do not cite to any cases or other authorities to support their argument that Title VII requires an interactive process. The relevant regulation does not discuss an interactive process." 2025 WL 266664, at *7 (citing 29 C.F.R. § 1605.2). Judge Chasanow relied on the Sixth Circuit's case in *Kizer*, in which "the United States Court of Appeals for the Sixth Circuit addressed this issue and found that while the ADA does require an interactive process, 'Title VII's regulations contain no similar reference to an interactive process.'" *Id.* (quoting *Kizer*, 2024 WL 4816856, at *3). Judge Chasanow

observed that in *Kizer,* the Sixth Circuit concluded that it could not, as a matter of law state that defendant "violated an implicit interactive-process duty under Title VII (as yet unrecognized in this circuit). [Defendant] has presented evidence of a thorough information-gathering process with input from Kizer herself. And the EEOC is clear that Title VII contains no such hard and fast requirement of an interactive process." *Id.* (citing *Kizer*, 2024 WL 4816856, at *5).

Here, the evidence reflects that Sheppard Pratt considered alternative options in assessing whether Plaintiff could be accommodated, including speaking with Plaintiff's supervisor to assess—if Plaintiff remained unvaccinated—whether Plaintiff's essential job functions could be reconfigured in a way that would maintain patient safety, Robertson-Keck Dep. in *Lindahl,* Tr. 18:12-19:14; conducting a meeting between Plaintiff and human resources personnel to discuss her exemption request, Lindahl Dep., Tr. 126:3-22; discussing with Plaintiff her skills, education, and resume to explore whether Plaintiff's skillset may qualify her for a different role with Sheppard Pratt that did not require face-to-face interaction, Robertson-Keck Dep. in *Lindahl*, Tr. 19:21-22:21; and reviewing Shepard Pratt's job postings on its website to see whether Plaintiff could be transferred into a vacant position she qualified for that could be performed remotely, Robertson-Keck Dep. in *Lindahl*, Tr., Tr. 23:13-19; ECF 26-6, Def.'s Objections and Responses to Pl.'s First Requests for Admission, at 5, 8-10.[19]

---

[19] Plaintiff asserts that Sheppard Pratt "failed to even propose reassignment to a vacant position and instead dismiss[ed] her by suggesting she apply for a position online if she decides to get vaccinated later, despite offering reassignment to others seeking religious exemptions." Pl.'s MSJ Opp'n, at 12. Plaintiff cites to Defendant's responses to the Requests for Admission Nos. 19-22 as support; however, these responses indicate that Ms. Robertson-Keck could not identify any vacant positions for which Plaintiff was qualified that could be performed remotely. *See id.*, at 7; ECF 26-6, at 5, 8-10 (Request for Admission No. 25). In any event, this does not constitute a genuine dispute of

Moreover, Sheppard Pratt also considered masking, daily and weekly testing, and social distancing.[20] Robertson-Keck Dep. in *Lindahl*, Tr. 19:6-21:17; Peters Dep., Tr. 21:2-11, 51:2-22; Peters Aff., at ¶¶ 50-64. Sheppard Pratt found such accommodations to be unsafe, not feasible, or less effective than vaccination against COVID-19. *Id.* Sheppard Pratt, in consultation with Plaintiff's supervisor, found that the Staff Nurse position could not be reconfigured, as face-to-face interaction was an essential function of the job. Robertson-Keck Dep. in *Lindahl*, Tr. 19:6-21:17; *see* Lindahl Dep., Tr. 127:1-128:22, 130:4-20, 139:2-10. Moreover, masking did not constitute an alternative accommodation because all employees were already required to wear masks regardless of vaccination status. Peters Aff., at ¶ 59. Sheppard Pratt concluded that it lacked the capacity or resources to implement weekly or daily testing on-site for employees. *Id.* at ¶¶ 63-64; *see* Peters Dep., Tr. 21:2-11, 51:2-22. In any event, Sheppard Pratt found testing to be an unreliable substitute to vaccination—Plaintiff's tests could produce false negatives, or she could become infected in between tests, risking infection exposure to others. Peters Aff., at ¶¶ 59-62. Further, the available medical data at that time suggested that vaccinated individuals were less likely to transmit COVID-19 than those that are unvaccinated, and

---

*material* fact because Defendant explored other alternatives, including masking and testing, but found neither option safe nor feasible. *See* Robertson-Keck Dep. in *Lindahl*, Tr. 19:15-20:5; Peters Aff. ¶¶ 50-69. Moreover, Plaintiff did not apply for any other positions at Sheppard Pratt. Lindahl Dep., Tr. 140:8-10.

[20] To the extent that Plaintiff argues that Defendant failed to "offer the alternative for Plaintiff to purchase PPE or COVID testing herself or provide her with any alternative approach to prevent any undue burden or costs to the employer[,]" this assertion does not change the Court's undue hardship finding. *See* Pl.'s MSJ Opp'n, at 8. Plaintiff does not offer any evidence in the summary judgment record to refute Sheppard Pratt's "conclusion that vaccinated people are less likely to infect others." *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 93 (1st Cir. 2025).

that transmission between unvaccinated individuals was the leading cause for the ongoing spread of the virus. *Id*. at ¶¶ 50-56.

Plaintiff attempts to assert that there remains a materially disputed fact that Plaintiff's face-to-face interactions were an "essential" function of her position, and that "[o]ther [c]ourts have held that whether or not a function is 'essential' is not suitable for summary judgment because it is a factual question for the jury." Pl.'s MSJ Opp'n, at 8, 13-14. The Court finds this argument unpersuasive. Specifically, the cases that Plaintiff relied on are dissimilar to the case here and instead involve the issue of whether the employee was able to perform the essential physical functions of their position, and whether reasonable accommodation would enable them to do so. *See, e.g.*, *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078-79 (6th Cir. 1988); *Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 764-65 (11th Cir. 1985), *aff'd and remanded sub nom. Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273 (1987); *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 283 (3d Cir. 2001). Such is not the case here.

Plaintiff also cites Sheppard Pratt's job description for her position of Staff Nurse, *see* Pl.'s MSJ Opp'n, at 8 (citing ECF 26-7), however, nothing in the job description supports Plaintiff's suggestion that face-to-face interactions were not an essential function of her job. Instead, the job description states, among other things, that a Staff Nurse administers medication, interviews and assesses patients, and involves "[w]orking with severely ill psychiatric patients very frequently" and "requires ability to physically intervene in medical and behavioral emergencies, transport patients, and lift patients." ECF 26-7, at 1-2. In fact, Plaintiff testified that, in her role as a Staff Nurse, she administered medication, conducted assessments, gave shots, took vital signs, and

26

engaged in behavior and crises interventions.  Lindahl Dep., Tr. 55:13-56:16. Even more, Plaintiff testified that her job duties required face-to-face contact with patients and that these activities could not be performed from home, *i.e.*, remotely.  *Id.*, Tr. 58:10-16.  As such, Defendant determined that Plaintiff could not perform her essential duties remotely.  *See Antredu*, 729 F. Supp. 3d at 84 ("It likewise imposes an undue burden to require an employer to relieve an employee of her essential job functions and assign them to another employee.") (citing *Bruff v. North Miss. Health Servs., Inc.*, 244 F.3d 495, 500 (5th Cir. 2001)).

For these reasons, the Court finds that Plaintiff has failed to adduce evidence creating a genuine dispute of material fact whether accommodating Plaintiff's religious exemption request constituted an undue hardship for Sheppard Pratt.  The summary judgment record, and the undisputed material facts therein, reflects that Sheppard Pratt based its decision to deny Plaintiff's exemption request on a variety of factors, including Plaintiff's essential job duties and COVID-19-related illnesses and deaths, and that Sheppard Pratt's reasons for refusing to accommodate Plaintiff's request, such as Sheppard Pratt's lack of resources for daily or weekly testing, masking policy for all employees, and inefficacy of other alternatives to testing, were substantiated.  *Accord Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1158-59 (D. Or. 2024) (concluding that "Title VII did not require Defendant to incur th[e] substantial cost"—economic, reputational, or otherwise—associated with "allowing unvaccinated employees to have direct, in-person contact with . . . other staff members and a vulnerable patient population").  Plaintiff's disagreement alone does not render those conclusions unreasonable.  *See Firestone Fibers & Textiles Co.*, 515 F.3d at 317 ("[A]n employer is not required 'to wait until it [feels] the effects' of the proposed accommodation before

27

determining its reasonableness . . . employers must be given leeway to plan their business operations and possible accommodative options in advance, relying on an accommodation's predictable consequences along the way."). As such, Sheppard Pratt was not required to accept increased risks to the health and safety of its employees and medically vulnerable children and adolescent patients because of Plaintiff's religious beliefs. *Lavelle-Hayden*, 744 F. Supp. 3d at 1158-59; *Dodson*, 2025 WL 1474319, at *11 (citing *Yockey*, 2025 WL 860158, at *6, and then citing *Marucci*, 2025 WL 860137, at *6).

Accordingly, as to Plaintiff's failure-to-accommodate claim against Sheppard Pratt, summary judgment is warranted because the undisputed material facts establish that Plaintiff's religious exemption request posed an undue hardship to Sheppard Pratt.

## II. Summary Judgment is <u>GRANTED</u> as to Plaintiff's religious discrimination claim under the disparate treatment theory.

As to Plaintiff's religious discrimination claim under the disparate treatment theory, there is no genuine dispute of material fact that (1) Plaintiff failed to identify a valid comparator and (2) Sheppard Pratt had non-discriminatory reasons for requiring Plaintiff to be vaccinated and for terminating her for her failure to do so.

To prove a Title VII religious discrimination claim under a disparate treatment theory, a plaintiff "must demonstrate that the employer treated her differently than other employees because of her religious *beliefs*." *Chalmers*, 101 F.3d at 1017 (emphasis in original). A plaintiff may prove discrimination through either (1) direct evidence of discrimination, or (2) through the familiar burden-shifting framework set forth in *McDonnell Douglas*. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Because she does not offer direct evidence of discrimination, Plaintiff must proceed under the *McDonnell Douglas* burden-shifting framework. *See Melendez v. Bd.*

*of Educ. for Montgomery Cnty.*, 711 F. App'x 685, 687 (4th Cir. 2017) (describing direct evidence as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision") (citation and internal quotation marks omitted).

Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination. *Haynes*, 922 F.3d at 223. If Plaintiff meets this *prima facie* burden, the burden then "shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, the burden reverts to Plaintiff to prove by a preponderance of evidence the employer's "proffered reason" is a pretext for discrimination. *Id.*

"Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'" *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (quoting *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010)). And "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). In considering the ultimate question, the Fourth Circuit has repeatedly cautioned district courts to "take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir 1987)). Nevertheless, "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Id.*

To establish a *prima facie* case of discrimination based on disparate treatment, Plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Polk v. Amtrak Nat'l R.R. Passenger Corp.*, 66 F.4th 500, 507 (4th Cir. 2023) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

As an initial matter, Defendant maintains that "it does not appear that Plaintiff is making a claim for disparate treatment." *See* Def.'s MSJ, at 31-32. However, Plaintiff argues that she "can establish a claim for disparate treatment." *See* Pl.'s MSJ Opp'n, at 17-18. There is no dispute that Plaintiff's termination constitutes an adverse employment action. Instead, the parties dispute: (1) whether Plaintiff can establish that she was treated differently than similarly situated employees outside of her protected class and (2) whether Plaintiff had a legitimate, nondiscriminatory reason for terminating Plaintiff. *See* Def.'s MSJ, at 31-33; Pl.'s MSJ Opp'n, at 17-18; Def.'s Reply, at 12-15.

First, "to establish a valid comparator," Plaintiff must produce evidence of particular comparators who were similarly situated, such as other employees who "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 219, 223-24 (alteration in original and citation omitted). She has not done so. Plaintiff attempts to advance the comparator theory on the basis that she "was treated differently because of her religious belief" and that Ms. Robertson-Keck approved religious exemption requests that "she "found more sincere" yet acted in a manner that left Plaintiff's religious beliefs "questioned and minimized to be 'not serious.'" Pl.'s MSJ

30

Opp'n, at 17. Plaintiff also asserts that she is similarly situated to those who received a medical exemption because if she were to "get[] vaccinated and go[] against her religious beliefs, she would be severely mentally and physically harmed, as the vaccine is a physical jab which contains a substance that Plaintiff's religion is deeply against." *Id.*, at 17-18. Further, Plaintiff appears to argue that Sheppard Pratt subjected her to disparate treatment "when they suggested to some seeking religious exemptions to gain approval by switching to a medical exemption request[,]" but did not do so for her despite the mental harm she alleges from vaccination. *Id.*, at 9.

Plaintiff's arguments miss the mark. She provides no evidence that any colleagues who were granted religious or medical exemptions were, in fact, similarly situated. *See Hurst v. D.C.*, 681 F. App'x 186, 191 (4th Cir. 2017) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.") (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). For example, Plaintiff failed to identify any evidence in the record as to the job requirements of the comparators, including whether the comparators had jobs that required direct face-to-face contact with patients that Plaintiff's job required; why Sheppard Pratt granted the potential comparators' requests; and what accommodations Sheppard Pratt granted to them. Moreover, as Defendant posits, "Plaintiff does not identify a single individual who was granted a religious exemption and permitted to work in a position that required face-to-face contact."[21] Def.'s Reply, at 13. Plaintiff has not offered any evidence, except for conjecture, that colleagues who were granted religious or medical exemptions were similarly situated. *See Sedar v. Reston Town Ctr. Prop., LLC*,

---

[21] During oral argument, defense counsel indicated that any nurses that received a religious exemption were not permitted to work in a patient-facing position.

988 F.3d 756, 761 (4th Cir. 2021) ("'[T]he mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion.") (quoting *Anderson*, 477 U.S. at 252); *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination.").

Moreover, as to those whose medical exemptions were granted, as noted above, the standard for disability accommodation is different than that for religious accommodation. *See, e.g., Groff*, 600 U.S. at 471; *see also Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479, at *7 (E.D. Pa. Feb. 18, 2022) (distinguishing medical from religious exemptions, stating that "[c]learly, some employees should not undergo vaccination due to medical complications and must be exempt from the vaccine requirement."). Moreover, as Defendant proffers, "Plaintiff never indicated that she had a medical contraindication that precluded her from receiving the vaccine nor did she apply for a medical exemption." Def.'s Reply, at 14. Plaintiff does not cite to any evidence to the contrary, other than her assertion that mental or emotional harm from vaccination would qualify for a medical exemption. Pl.'s MSJ Opp'n, at 9. However, "mental anguish" does not constitute "a [medical] condition for which the [COVID-19] vaccine is contraindicated." *See Together Emps.*, 573 F. Supp. 3d at 429-30. In short, there is no evidence from which a reasonable jury could find that Plaintiff was subjected to "different treatment from similarly situated employees outside the protected class." *Polk*, 66 F.4th at 507.

Further, even if Plaintiff established a valid comparator, the Court finds that Sheppard Pratt is entitled to summary judgment because, for the same reasons as discussed above for the failure-to-accommodate claim, Sheppard Pratt had non-

discriminatory reasons for requiring Plaintiff to be vaccinated, including the safety of its patients and employees. *See e.g.*, *Smith v. St. Joseph's Med. Ctr.*, No. 22-CV-5231, 2024 WL 2058619, *4 (S.D.N.Y. May 7, 2024) (affirming employee's termination for religion-based refusal to comply with employer's COVID-19 vaccination mandate). To the extent that Plaintiff asserts that Sheppard Pratt permitted her to work for a period after they denied her exemption request—thereby invalidating Defendant's position that Plaintiff posed a serious safety risk that justified her termination—the Court finds this argument unavailing. Plaintiff submitted her religious exemption request in August 2021. *See* Lindahl Dep., Tr. 117:19-120:12; Pl.'s Exemption Request, at 1-4. Sheppard Pratt denied her religious exemption request on October 13, 2021. *See* Lindahl Dep., Tr. 126:3-22; Robertson-Keck Dep. in *Lindahl*, Tr. 19:6-21:17. Plaintiff's last day of employment at Sheppard Pratt was November 19, 2021 (or sometime in December 2021, according to Plaintiff's brief). Courts have found undue hardship even where there is a delay between the denial of the exemption request and the employee's termination. *See Hall v. Shepard Pratt Health Sys., Inc.*, 749 F.Supp.3d at 537-40, 547-48 (D. Md. 2024) (plaintiff requested religious exemption to Sheppard Pratt's vaccination policy on August 30, 2021, had her request denied in October 2021, and was terminated in November 2021); *Yockey*, 2025 WL 860158, at *2 (plaintiff requested a religious exemption on August 27, 2021, her request was denied on September 15, 2021, a subsequent request was denied on October 4, 2021, and she worked until November 1, 2021); *MacDonald v. Oregon Health & Sci. Univ.*, No. 3:22-CV-01942-IM, 2024 WL 3316199 (D. Or. July 5, 2024) (plaintiff submitted a religious exemption request in September 2021, had her request rejected October 7, 2021, and was terminated in December 2021). As such, the Court finds that

33

there is no genuine dispute of material fact that Sheppard Pratt had non-discriminatory reasons for requiring Plaintiff to be vaccinated and terminating her for failure to do so.

Moreover, Plaintiff has not identified any evidence upon which a reasonable jury could find that requiring Plaintiff to be vaccinated was a pretext for discriminating against her because of her religion. *See D'Cunha v. Northwell Health Sys.*, No. 1:22-CV-0988 (MKV), 2023 WL 2266520 at *2 (S.D.N.Y. Feb. 28, 2023) (dismissing disparate treatment claim where the plaintiff alleged "she was terminated because Northwell insisted that she take a vaccine—not because of her religion"); *Anderson v. United Airlines, Inc.*, No. 23 C 989, 2023 WL 5721594, at *6 (N.D. Ill. Sept. 5, 2023), *reconsideration denied*, No. 23 C 989, 2024 WL 1555496 (N.D. Ill. Apr. 10, 2024) (plaintiff failed to allege a viable disparate treatment claim where he alleged that he was treated differently than co-workers who received the COVID-19 vaccine). Among other things, Sheppard Pratt told Plaintiff that she could apply for other positions within Sheppard Pratt—although as stated above, Plaintiff refutes this—and Plaintiff was also informed that she remained eligible for rehire should she become vaccinated or Sheppard Pratt's vaccination policy change. Robertson-Keck Dep. in *Lindahl*, Tr. 19:21-23:19, 35:2-13; *see* ECF 26-3 (Plaintiff's personnel file indicating that she is eligible for rehire).

Also, Plaintiff's counsel insisted at oral argument that Sheppard Pratt did not go far enough in exploring Plaintiff's religious beliefs; counsel argued that had Ms. Robertson-Keck or someone else inquired more deeply into Plaintiff's beliefs, they would have understood how sincere she was. This seems to not only contradict her argument that Ms. Robertson-Keck questioned the sincerity of her beliefs, Pl.'s MSJ Opp'n, at 17, but it also appears consistent with Title VII's prohibition of discriminating on religious

grounds. That is, by assuming sincerity and not probing the depth of a person's sincerity, an employer stands a better chance of not running afoul of Title VII.

Accordingly, as to Plaintiff's disparate treatment claim against Sheppard Pratt, Defendant is entitled to summary judgment because the undisputed material facts establish the absence of a valid comparator and the presence of Sheppard Pratt's non-discriminatory reasons for requiring Plaintiff to be vaccinated and terminating her for her failure to do so.

### III.    Summary Judgment is <u>GRANTED</u> as to Plaintiff's retaliation claim.

The undisputed material facts support that Plaintiff failed to establish both that she engaged in a protected activity and the existence of causal retaliatory connection between the purported protected activity and her termination.

To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman*, 626 F.3d at 190 (citing *Mackey*, 360 F.3d at 469). Under Title VII, the familiar *McDonnell Douglas* burden-shifting framework applies to retaliation claims. *See, e.g.*, *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018).

Defendant maintains that "Plaintiff does not appear to assert a retaliation claim given her single passing reference to retaliation in her Complaint and her failure to plead any facts that would support such a claim." *See* Def.'s MSJ, at 34 (citing Complaint, ECF 1, at ¶ 42). Beyond that, Sheppard Pratt argues that Plaintiff cannot satisfy that she engaged in a protected activity or establish a causal connection between any purported activity and her termination. Def.'s MSJ, at 34-35; Def.'s Reply, at 16. Plaintiff argues that she "engage[d] in a protected activity when she requested a religious exemption[,]"

35

and that "[b]ut-for Plaintiff engaging in protected activity, she would have been allowed to continue working unvaccinated, as she had been up until December 2021." Pl.'s MSJ Opp'n, at 18-19. Notably, Plaintiff's entire retaliation argument does not cite any caselaw or any evidence to support her arguments. *See id.* During the hearing, Plaintiff asserted that *Firestone Fibers* supports the position that a religious exemption request constitutes a protected activity. However, that case did not involve a retaliation claim. Thus, the Court finds it of no assistance to Plaintiff.

Defendant maintains that "merely requesting a religious accommodation is not protected activity under Title VII." Def.'s MSJ Opp'n, at 34 (citing *Perlman v. Mayor and City Council of Baltimore*, No. SAG-15-1620, 2016 WL 640772, at *6 (D. Md. Feb. 18, 2016) (stating that "making a religious accommodation request is not protected activity."); *Bushra*, 709 F. Supp. 3d at 172-73 (quoting *EEOC v. North Memorial Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018) ("'[M]erely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation.' . . . Although the latter is protected activity under Title VII, the former is not.")). As Defendant correctly posits, "Plaintiff does not allege that she complained of discrimination or otherwise opposed any unlawful practice during her employment." *See* Def.'s MSJ Opp'n, at 34. Thus, the Court finds that Plaintiff failed to establish that she engaged in protected activity. *See Stafford v. Acadia Pharms. Inc.*, No. 1:23-CV-03230-JRR, 2025 WL 754483, at *10-11 (D. Md. Mar. 10, 2025) (finding that Plaintiff's religious accommodation request does not constitute a protected activity).

Even if Plaintiff could establish that she engaged in a protected activity, she fails to establish a triable issue regarding the causal connection between her exemption request and termination. Plaintiff asserts that her religious exemption request "is causally

36

connected to the Defendant's actions because the Defendants have admitted they terminated Plaintiff for failing to get the vaccine" and refusing to accommodate her; Plaintiff also states that "Defendant did not terminate Plaintiff for not being vaccinated (they have many employees working unvaccinated)[,] they terminated her because of her religious belief which they question." Pl.'s MSJ Opp'n, at 19.  However, Plaintiff does not offer any legal authority or evidence supporting her assertions.  *See Kline v. Certainteed Corp.*, 205 F. Supp. 2d 468, 474 (D. Md. 2002) ("To survive summary judgment . . . [a plaintiff] must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

As explained above, pursuant to Sheppard Pratt's vaccination policy, Plaintiff was terminated because she failed to comply with the policy by not receiving the COVID-19 vaccine.  Robertson-Keck Dep. in *Lindahl*, Tr. 37:2-21; *see* ECF 25-2, at 28.  Plaintiff offers no evidence to support her claims that she was terminated or otherwise retaliated against because she submitted a religious exemption request.  *See Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2023 WL 7549365, at *5 (S.D.W. Va. Nov. 14, 2023) (plaintiff could not state a retaliation claim in part because "[h]is choice not to get vaccinated by the February 23, 2022, deadline[] would have resulted in his subsequent termination whether or not he submitted such exemption requests").  In short, Plaintiff provides nothing on which a reasonable jury could rely to conclude that she was terminated because she sought a religious-based exemption or that terminating her was a pretext for retaliation.  Therefore, even accepting, *arguendo*, that an exemption request is protected activity, Plaintiff fails to generate a dispute of material fact as to the reason or basis for,

or even an unlawful motivating factor contributing to, her termination. *See Stafford*, 2025 WL 754483, at *11.

Accordingly, as to Plaintiff's retaliation claim against Sheppard Pratt, summary judgment is warranted. The undisputed material facts demonstrate Plaintiff's failure to establish that she engaged in a protected activity and even a possibility of a causal connection between the purported protected activity and her termination.

## II.   CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (ECF 25) is GRANTED. A separate implementing order shall issue.

Date: March 3, 2026                               /s/                      
                                        Charles D. Austin
                                        United States Magistrate Judge